UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
EXXON MOBIL CORPORATION,

        Plaintiff,

- against -

TREDEGAR CORPORATION,

        Defendant.
------------------------------------- X

Civil Action No.: 11-CV-2829 (MGC) (GWG)

ECF Case

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Exxon Mobil Corporation ("Exxon"), as successor-in-interest to Exxon Corporation, by and through its undersigned counsel, hereby files this Amended Complaint and, in support thereof, avers as follows:

### NATURE OF THE ACTION

Exxon incurred compensatory and consequential damages as a result of defendant Tredegar Corporation's ("Tredegar") failure to honor the contractual obligations set forth in the Asset Purchase Agreement between the parties. First, Tredegar refused to indemnify Exxon in connection with a lawsuit filed by Leo Leinheiser, then a former employee of Tredegar, and his wife, Diane Leinheiser, for injuries Mr. Leinheiser sustained on the job at a Tredegar facility. Second, Tredegar hindered Exxon's ability to defend the Leinheisers' claims efficiently and effectively by refusing to cooperate with Exxon or provide Exxon with access to key documents and essential witnesses that were solely in Tredegar's care, custody, or control. At best, Tredegar's conduct is in complete ignorance of the express terms of the contract; at worst, it is motivated by Tredegar's interest in ensuring recovery of at least a portion of the workers' compensation benefits it has provided to Mr. Leinheiser.

## PARTIES

1. Plaintiff Exxon is a New Jersey corporation with its principal place of business and corporate headquarters at 5959 Las Colinas Boulevard, Irving, Texas 75039.

2. Upon information and belief, defendant Tredegar is a Virginia corporation with its principal place of business at 1100 Boulders Parkway, Richmond, Virginia 23225.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity between the parties and the matter in controversy exceeds $75,000, exclusive of interest and costs.

4. Pursuant to Section 15.12 of the Asset Purchase Agreement, the parties have consented to personal jurisdiction in New York.

5. Pursuant to Section 15.12 of the Asset Purchase Agreement, the parties have consented to venue in the Southern District of New York.

## CHOICE OF LAW

6. Pursuant to Section 15.12 of the Asset Purchase Agreement, New York law governs the validity and interpretation of the Asset Purchase Agreement.

## FACTUAL BACKGROUND

**A.  Tredegar's Acquisition of Exxon's Film Business**

7. Prior to May 1999, Exxon manufactured and distributed film products through its division, Exxon Chemical Company (the "Film Business"). *See* Asset Purchase Agreement §§ 1.11 and 1.31.*

---

* Exxon attached a copy of the complete Asset Purchase Agreement, including Schedules and side agreements, as Exhibit A to the Declaration of Daniel B. Carroll, Esquire in support of Exxon's Opposition to Defendant's Motion to Dismiss.

8. On May 17, 1999 (the "Closing Date"), Tredegar purchased Exxon's Film Business for more than $170,000,000 (the "Acquisition").

9. As part of the Acquisition, Tredegar acquired, among other things, two manufacturing facilities (one in Illinois and one in Pennsylvania), Asset Purchase Agreement §§ 1.65, 2.1.1, and 3.1, Schedule 1.65(a) and 1.65(b); five leased properties (two in Illinois, two in Texas, and one in Pennsylvania), Asset Purchase Agreement §§ 1.64 and 2.1.2, Schedule 1.64; other tangible property including, for example, eight vehicles (three registered in Ohio, three registered in Illinois, and one registered in Pennsylvania), Asset Purchase Agreement §§ 2.1.3, Schedule 2.1.b(3), Tab 31; and inventory located in Illinois, Texas, California, Tennessee, Georgia, Delaware, Connecticut, and New York, Asset Purchase Agreement § 2.1.9, Schedule 2.1.9.

10. The Film Business also had numerous vendor contracts, sales contracts, active purchase orders, licensing agreements, permits, and patents with entities located in a number of states and foreign countries. *See, e.g.*, Asset Purchase Agreement §§ 2.1.3, Schedule 2.1.b(3), Tab 31.

11. Pursuant to Sections 4.3 and 10.14 and Schedule 1.20(a) of the Asset Purchase Agreement, key personnel and other employees who had been employed by Exxon continued their employment with Tredegar; such employees included, but were not limited to, the safety coordinator, machine operators, and maintenance mechanics.

12. Pursuant to Section 2.1 and Schedule 2.1.3(a) of the Asset Purchase Agreement, a Dusenbery 815B slitter machine (the "Slitter Machine") was among the machinery and equipment Tredegar purchased.

13. Since the Closing Date, Tredegar has made all decisions with respect to the operation of the Film Business and those regarding the ownership, operation, maintenance, and condition of the Slitter Machine, including all decisions related to any safety procedures for operating and maintaining the Slitter Machine.

**B.     Mr. Leinheiser's Accident**

14. On April 20, 2007, Mr. Leinheiser, then a maintenance mechanic for Tredegar, suffered severe and disfiguring injuries while he was cleaning the Slitter Machine used in the operation of Tredegar's film business (the "Accident").

15. The cleaning method Mr. Leinheiser used – a handheld wire brush while the machine was running – violated Occupation Safety & Health Administration ("OSHA") regulations, which require use of a safety procedure that eliminates power to machinery (i.e., lock out/tag out).

16. The cleaning method Mr. Leinheiser used was a direct and substantial cause of his injuries – had Mr. Leinheiser eliminated power to the Slitter Machine using the lock out/tag out procedure, the Accident would not have occurred.

**C.     Tredegar's Responsibility and Liability for the Accident**

17. Tredegar, as Mr. Leinheiser's employer at the time of the Accident, was responsible for the safety of its employees and had a duty to ensure that the members of its maintenance department, including Mr. Leinheiser, complied with mandatory federal OSHA regulations that require employees to use lock out/tag out procedures prior to performing maintenance on machinery like the Slitter Machine.

18. Because Tredegar failed to comply with OSHA regulations, it too was a direct and substantial cause of Mr. Leinheiser's injuries.

19. Tredegar resolved its liability and responsibility to Mr. Leinheiser for his injuries resulting from the Accident through the payment of workers' compensation benefits.

### D. The Underlying Litigation

20. In an attempt to recover beyond the statutory limits available under the applicable workers' compensation scheme, on April 17, 2009 and April 20, 2009, Mr. Leinheiser and his wife, Diane Leinheiser, filed complaints (the "Leinheiser Complaints") with causes of action sounding in strict liability, negligence, breach of warranty, and loss of consortium. True and correct copies of the Leinheiser Complaints are attached hereto as Exhibits A and B, respectively.

21. The Leinheiser Complaints named as defendants Exxon and numerous other entities, including the manufacturer of the Slitter Machine, the company that refurbished the Slitter Machine, and others whose names appeared on miscellaneous invoices and bids (even unsuccessful ones) in connection with work performed on the Slitter Machine (the "Underlying Litigation").

22. The Leinheiser Complaints were served on Exxon on June 15, 2009. The Affidavits of Service for each of the Leinheiser Complaints are attached as Exhibits C and D, respectively.

### E. Exxon's Demand for Indemnification and Tredegar's Refusal

23. The Leinheiser Complaints triggered Tredegar's obligation under the Asset Purchase Agreement to indemnify Exxon for any losses in connection with "any Assumed Liability" or "any liability arising out of or related to the operation of the Business after the Closing Date." Asset Purchase Agreement § 14.4.

24. Pursuant to Section 14.7.1 of the Asset Purchase Agreement ("Procedures for Indemnification"), on June 30, 2009, Exxon sent a notice of tender of defense and demand for

indemnification ("Demand for Indemnification") to Tredegar. The letter from Exxon to Tredegar dated June 30, 2009 is attached hereto as Exhibit E.

25. The Demand for Indemnification attached the Leinheiser Complaint and specified the basis for Tredegar's indemnification obligations. *See id.*

26. On September 30, 2009, Randy Reaves, then Assistant General Counsel at Tredegar, responded orally to Exxon's June 30, 2009 Demand for Indemnification; Tredegar refused to honor its contractual obligation.

27. By letter dated March 17, 2011, Mary Hoge Anderson, Senior Counsel at Tredegar, confirmed in writing Tredegar's earlier declination of Exxon's Demand for Indemnification. The letter from Ms. Anderson to Exxon dated March 17, 2011 is attached hereto as Exhibit F.

### F.  Exxon's Defense of the Underlying Litigation

28. Based on Tredegar's response, Exxon had no choice but to proceed in its defense of the Underlying Litigation.

29. As Exxon had sold its Film Business to Tredegar almost ten years earlier, the vast majority of the records and employees essential to a proper defense of the Underlying Litigation were in the care, custody, or control of Tredegar.

30. To that end, Exxon requested that Tredegar make these documents and employees available to assist in its defense.

31. Although Mr. Reaves declined to honor Tredegar's indemnification obligation, he agreed to cooperate with Exxon in its defense of the Underlying Litigation, including providing an affidavit in support of certain facts and allowing Exxon to interview individuals with knowledge of the operative facts.

32. In October 2009, Mr. Reaves allowed Exxon to speak with Art Knapp who was Tredegar's Plant Safety Coordinator at the time of the Accident.

33. Following a six-month stay of the Underlying Litigation (resulting from the bankruptcy of another defendant named in the Leinheiser Complaints), on May 11, 2010, the Leinheisers noticed the videotaped deposition of a corporate representative of Exxon most knowledgeable about the acquisition of the Slitter Machine and any modifications, repairs, and maintenance performed on the Slitter Machine.

34. As any former Exxon employee with knowledge of some or all of these topics would have continued their employment with Tredegar pursuant to Sections 4.3 and 10.14 of the Asset Purchase Agreement, Exxon contacted Mr. Reaves to determine if an existing Tredegar employee was the most appropriate representative.

35. Mr. Knapp volunteered to speak with Exxon about this issue, but Mr. Reaves referred Exxon to Ms. Anderson because Mr. Reaves was leaving his position.

36. In July 2010, Ms. Anderson advised Exxon that Tredegar intended to produce a number of employees for deposition.

37. Tredegar's outside counsel, Alexander J. Palutis, initially confirmed that Exxon would be permitted to interview these individuals in advance of their depositions.

38. Mr. Palutis also represented that there would be "no surprises" and that Exxon's "position of no liability in [the Underlying Litigation] is solid."

39. Pursuant to these discussions, Mr. Palutis's office arranged for Exxon to interview the employees Tredegar intended to produce for deposition.

40. Then, less than one week before the scheduled interviews, Mr. Palutis informed Exxon that it could not have access to these individuals because Exxon and Tredegar have an "adverse interest in this matter."

41. There was no "adverse interest" between Tredegar and Exxon vis-à-vis the Leinheisers, however, because Tredegar had an obligation to indemnify Exxon for any losses it incurred as a result of the Underlying Litigation and Tredegar was insulated from suit by the Leinheisers.

42. It was in the best interests of both Tredegar and Exxon to resolve the Underlying Litigation with as little expense as possible.

43. Any "adversity" existed only if Tredegar intended to assist the Leinheisers in maximizing the Leinheisers' recovery in an effort to increase the possibility that it would recoup some or all of the workers' compensation benefits it previously paid to Mr. Leinheiser.

44. The witnesses Tredegar produced made it clear that Tredegar had adopted this exact strategy.

45. At their depositions, Tredegar's employees revealed that, not only had Tredegar improperly prevented Exxon access to these individuals, Tredegar had in fact allowed counsel for the Leinheisers to participate at their deposition preparation sessions.

46. At the same time, Tredegar, through Mr. Palutis, repeatedly assured Exxon that it would have an opportunity to inspect a number of documents in Tredegar's possession (e.g., meetings of safety meetings, sign-in sheets for monthly training meetings, and videos played during monthly safety meetings).

47. Although Mr. Palutis assured Exxon on more than one occasion that it was not necessary to subpoena these documents, Tredegar never provided them.

48. In December 2010, still believing that Tredegar would honor its contractual obligations and fulfill its numerous promises, Exxon approached Ms. Anderson to request that Tredegar provide an affidavit from a Tredegar employee who was aware of the circumstances surrounding the Accident and could provide additional detail regarding operation of the Tredegar facility (the "Affidavit").

49. Ms. Anderson again confirmed that Tredegar would cooperate with Exxon in its defense and agreed to provide the Affidavit.

50. In or around February 2011, pursuant to their agreement, Exxon forwarded a draft affidavit to Ms. Anderson.

51. By letter dated March 17, 2011, Tredegar, for the first time, expressly refused to assist Exxon in its defense of the Underlying Litigation. Ms. Anderson explained,

> Exxon has also requested that Tredegar make its employees available to Exxon for interviews and/or depositions related to the Leinheiser case. Tredegar must decline on both counts as explained below.
>
> . . . .
>
> With regard to Exxon's request to interview or depose various Tredegar employees, Tredegar respectfully declines to make those employees available. Tredegar is not a party to the Leinheiser action and has no duty to participate in discovery in that action particularly in light of Exxon's indemnification demand, and Exxon's potentially adverse interest *vis-à-vis* Tredegar.

Ex. F.

52. Notably, Ms. Anderson's letter arrived just ten days after discovery in the Underlying Litigation closed.

53. Perhaps even more important, two weeks after Tredegar refused to make employees available for depositions or interviews, Tredegar voluntarily granted one of the Leinheisers' experts access to the Mar-Lin facility to inspect the Slitter Machine.

54. Tredegar did not notify Exxon, or, upon information and belief, any other party to the Underlying Litigation, regarding this additional inspection opportunity.

55. Thus, not only did Tredegar ignore its contractual duties to "cooperate" with Exxon and provide it "reasonable access" in connection with the Underlying Litigation, *see* Asset Purchase Agreement §§ 12.6, 12.7, 15.13, Tredegar actually worked *against* Exxon, providing the Leinheisers the very resources Exxon requested (and to which it had a contractual right).

56. Upon information and belief, Tredegar's behavior was motivated by its own self-interest – to recoup a workers' compensation lien if the Leinheisers were to recover a significant judgment in the Underlying Litigation.

### G. Mediation of the Underlying Litigation and Settlement Negotiations

57. In early 2011, the Leinheisers and co-defendants REM Manufacturing, John Dusenbery Co., Inc., and Dusenbery Worldwide approached Exxon about participating in a voluntary, private mediation.

58. On May 3, 2011, the parties to the Underlying Litigation took part in the voluntary mediation.

59. Mr. Palutis appeared at the mediation on behalf of Tredegar.

60. Co-defendants REM Manufacturing, John Dusenbery Co., Inc., and Dusenbery Worldwide settled their disputes with the Leinheisers.

61. Exxon did not resolve its dispute with the Leinheisers at the mediation.

62. In advance of a June 14, 2011 Pre-Trial Conference in the Court of Common Pleas of Philadelphia County, the Leinheisers submitted a memorandum wherein they demanded from Exxon alone the amount of $2,000,000 to settle the Underlying Litigation.

63. Although Tredegar waived its right to defend or contest the manner in which Exxon defended the Underlying Litigation, including Exxon's decision to resolve the Underlying Litigation or the reasonableness of such settlement amount, *see* Sections 14.7.1 and 14.7.3 of the Asset Purchase Agreement, Exxon involved Tredegar and its counsel in subsequent settlement discussions with the Leinheisers' counsel.

64. Despite numerous attempts, Exxon and Tredegar ultimately were not able to resolve their dispute.

65. Nevertheless, Exxon was able to resolve the Underlying Litigation and the Leinheisers and Exxon settled the Underlying Litigation for $250,000.

66. Based on the totality of the circumstances, including but not limited to the amounts paid by Exxon's co-defendants, the amount paid by Exxon is reasonable.

## COUNT I
## BREACH OF CONTRACT

67. Exxon incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein.

68. The Asset Purchase Agreement is a valid and binding contract.

69. Exxon's and Tredegar's various rights and obligations relating to the Acquisition are set forth in the Asset Purchase Agreement.

70. Recognizing that it would not have any means by which to prevent any liabilities arising out of or relating to Tredegar's operation of the Film Business, Exxon bargained for and obtained a right to be indemnified by Tredegar for future liabilities incurred by Exxon that relate to or arise out of Tredegar's operation of the Film Business and Slitter Machine. *See* Asset Purchase Agreement § 14.4.

71. Tredegar's obligation to indemnify Exxon is set forth clearly in Sections 14.4 and 14.5.4 of the Asset Purchase Agreement (collectively, the "Indemnification Provisions"). Section 14.4 states in relevant part:

> "[Tredegar] General Liabilities" shall mean all Losses . . . resulting from, arising out of, or incurred by any of [Exxon] or its Affiliates, any of their officers and directors, or any of their respective successors or assigns (each a "Seller Indemnified Party") after the Closing Date [May 17, 1999] in connection with . . . *(iii) any Assumed Liability or any attempt (whether or not successful) by any Person to cause or require [Exxon] to pay or discharge any Assumed Liability*; . . . or *(v) any liability arising out of or related to the operation of the Business after the Closing Date [May 17, 1999]*, other than Retained Liabilities. Subject to the provisions of Section 13.3 and to the further provisions of this Article 14.0, [Tredegar] covenants and agrees with [Exxon] that [Tredegar] shall pay, and shall indemnify all Seller Indemnified Parties, and hold them harmless from, against and in respect of, any and all [of Tredegar's] General Liabilities.

(Emphasis added.)

72. First, as a result of its defense of the Underlying Litigation, Exxon sustained damages "in connection with . . . (iii) any Assumed Liability," which is defined by Section 4.2 of the Asset Purchase Agreement and Schedule 4.2 thereof ("Assumed Liabilities and Obligations") as:

> 4. All obligations and liabilities relating to the ownership or operation of the Purchased Assets or the conduct of the Business that arise out of an event, act or occurrence occurring subsequent to the Closing Date [May 17, 2009.]

Asset Purchase Agreement, Schedule 4.2.

73. The Slitter Machine is expressly identified in the Asset Purchase Agreement as a Purchased Asset. *See* Schedule 2.1.3(a).

- 12 -

74.     Second, as a result of its defense of the Underlying Litigation, Exxon sustained damages "in connection with . . . (v) any liability arising out of or related to the operation of the Business after the Closing Date [May 17, 1999]. . . ."

75.     Moreover, the damages Exxon incurred in connection with the Underlying Litigation constitute "Losses," as defined by Section 1.43 of the Asset Purchase Agreement, which states in relevant part:

> The term **"Losses"** shall mean all losses, costs, claims, liabilities, fines, penalties, judgments, awards, damage, expense (including costs of investigation and defense and reasonable attorneys' fees and expenses), in any such case whether or not involving a third-party claim, including, without limitation, all payments made or damages paid to third parties . . . .

76.     Tredegar has "an absolute obligation to make the payments and satisfy its obligations under . . . clauses (iii) [and] (v) of Section 14.4 and 15.1 of this Agreement without regard to the time and money limitations of this Article 14.0." Asset Purchase Agreement § 14.5.4.

77.     Based on the above, Tredegar agreed, and has an absolute obligation, to "indemnify" Exxon for the following:

(a) any "Losses," as defined by Section 1.43 of the Asset Purchase Agreement, incurred by Exxon "in connection with" any obligation or liability "related to the ownership or operation" of the Slitter Machine "that arises out of an event, act or occurrence occurring subsequent to the Closing Date";

(b) any attempt (whether or not successful) by any Person to require Exxon to pay for any obligation or liability "related to the ownership or operation" of the Slitter Machine "that arises out of an event, act or occurrence occurring subsequent to the Closing Date";

(c) any "Losses," as defined by Section 1.43 to the Asset Purchase Agreement, "related to the operation of the Film Business after the Closing Date [May 17, 1999]";

    (d)    costs of investigation, defense, and reasonable attorneys' fees and expenses, Asset Purchase Agreement §§ 1.43 and 14.4; and

    (e)    "reasonable out-of-pocket attorneys' fees, costs and expenses incurred in connection with the prosecution . . . of [this breach of contract] action," Asset Purchase Agreement § 15.16.

78. In fact, Tredegar conceded it has an obligation to indemnify Exxon under the Asset Purchase Agreement. *See* Def.'s Mem. of Law (Doc. No. 11) at 6-7 ("Tredegar, in turn, is required to indemnify Exxon with respect to . . . any Assumed Liability, and then a catchall: 'any liability arising out of or related to the operation of the Business after the Closing Date, other than the Retained Liabilities.'").

79. The Underlying Litigation is not a Retained Liability, which is defined in Section 1.67 of the Asset Purchase Agreement as:

> all liabilities and obligations of Seller whether such liabilities and obligations relate to payment, performance or otherwise, arise before or after the Closing, are matured or unmatured, are known or unknown, are contingent or non-contingent, are fixed or undetermined, or are present, future or otherwise, other than the Assumed Liabilities. . . . Notwithstanding anything to the contrary contained herein, and without limiting the foregoing, the following liabilities and obligations of Seller shall be considered Retained Liabilities for purposes of this Agreement:
>
> . . . .
>
> (v)    any liability or obligation arising out of any legal proceeding pending as of the Closing Date, whether or not set forth in <u>Schedule 6.8</u> or <u>6.9</u>, or any legal proceeding commenced after the Closing Date to the extent it arises out of, or relates to, any occurrence or event happening before the Closing Date . . . .

80. First, the Underlying Litigation does not arise out of or relate to an "occurrence or event" happening before the Closing Date; instead, it arises out of the Accident of April 20, 2007.

81. Second, Assumed Liabilities are specifically excluded from the definition of Retained Liabilities and, as outlined above, the Underlying Litigation is an Assumed Liability.

82. As of May 17, 1999, Tredegar assumed all obligations and liabilities relating to the ownership and operation of the Slitter Machine.

83. The Accident giving rise to the Underlying Litigation occurred on April 20, 2007, almost eight years after the Acquisition, when Mr. Leinheiser was severely injured while he was cleaning the Slitter Machine, which was used in the operation of Tredegar's film business.

84. The Underlying Litigation triggered Tredegar's Indemnification Obligations under the Asset Purchase Agreement.

85. Exxon complied with all of its obligations under the Asset Purchase Agreement.

86. Tredegar breached its contractual obligations under the Asset Purchase Agreement by failing to comply with its Indemnification Obligations.

87. Tredegar refused to comply with its Indemnification Obligations in violation of the duty of good faith and fair dealing implicit in every contract.

88. As a direct result of Tredegar's breach, Exxon has suffered damages in an amount to be proven at trial including, but not limited to, the costs of defending the Underlying Litigation (i.e., the cost of settlement and attorneys' and experts' fees) and pursuing this lawsuit to enforce its rights.

## COUNT II
## BREACH OF CONTRACT
## (Breach of Duty to Cooperate)

89. Exxon incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein.

90. The Asset Purchase Agreement is a valid and binding contract.

91. Article 12 of the Asset Purchase Agreement governs the parties' "Obligations After the Closing Date," which include an obligation on Tredegar to "cooperate" with Exxon and to "provide reasonable access" to records and/or employees of its business in connection with litigation by third parties.

92. First, Section 12.6 ("Further Assurances of Purchaser") of the Asset Purchase Agreement requires:

> From and after the Closing Date, [Tredegar] shall afford [Exxon] and its attorneys . . . access, during normal business hours, to such books and records relating to the Business as may reasonably be required. [Tredegar] shall cooperate in all reasonable respects with [Exxon] with respect to its former interest in the Business and in connection with . . . claims and litigation asserted by or against third parties, including, but not limited to, making employees available to assist with, or provide information in connection with . . . claims and litigation . . . .

93. Second, Tredegar also had a duty to "cooperate fully" and "without limitation" in litigation or disputes concerning "Assumed Liabilities"; Section 12.7 states in relevant part:

> [Tredegar] shall provide reasonable access to [Exxon] to review any records that Tredegar retains and to make copies thereof and shall cooperate fully with Exxon (including without limitation, making available employees to assist Exxon at reasonable rates to be agreed upon by the parties) in . . . claims, litigation or disputes concerning . . . the *Assumed Liabilities* or for any other reasonable business purpose.

94. Third, pursuant to Section 15.13 of the Asset Purchase Agreement, Tredegar had a duty to "cooperate fully at their own expense . . . with [Exxon's] counsel . . . in connection with all steps to be taken as part of their obligations under [the Asset Purchase Agreement]."

95. The Underlying Litigation triggered Tredegar's duties to cooperate and provide reasonable access under the Asset Purchase Agreement.

96. Numerous representatives of Tredegar repeatedly promised "cooperation" and "reasonable access" as contemplated by the Asset Purchase Agreement.

- 17 -

97. Exxon relied upon these representations to its detriment.

98. As set forth in detail above, Tredegar has breached its contractual obligations under the Asset Purchase Agreement by failing to cooperate and provide reasonable access.

99. Tredegar refused to comply with its contractual obligation to cooperate and provide reasonable access in violation of the duty of good faith and fair dealing implicit in every contract.

100. Upon information and belief, Tredegar's decisions to ignore its contractual obligations were motivated less by the language of the Asset Purchase Agreement and more by its desire to recover at least a portion of its workers' compensation expenditures.

101. As a direct and consequential result of Tredegar's breaches, Exxon was prejudiced in its defense of the Underlying Litigation and has suffered damages in an amount to be proven at trial.

## DEMAND FOR RELIEF

WHEREFORE, by reason of the foregoing, Exxon demands judgment against Tredegar for compensatory damages, consequential damages (as applicable), pre-judgment and post-judgment interest, attorneys' fees and costs, and such further relief permitted by the Asset Purchase Agreement or as the Court deems just and proper.

**JURY DEMAND**

Exxon demands a trial by jury on any issue triable of right by a jury.

Dated: August 3, 2011
                        DRINKER BIDDLE & REATH LLP

                                    By: _____
                                             Daniel B. Carroll

500 Campus Drive
Florham Park, New Jersey 07932-1047
(973) 549-7000 (Telephone)
(973) 360-9831 (Facsimile)
daniel.carroll@dbr.com

Gregory P. Miller (Admitted *pro hac vice*)
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103-6996
(215) 988-2700 (Telephone)
(215) 988-2757 (Facsimile)
gregory.miller@dbr.com

Attorneys for Plaintiff
Exxon Mobil Corporation