UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

EXXON MOBIL CORPORATION,                    :        11 Civ. 2829 (MGC)
                                            :
                        Plaintiff,          :
                                            :
              -against-                     :
                                            :
TREDEGAR CORPORATION,                       :
                                            :
                        Defendant.          :
                                            :
-------------------------------------------------------------- x


### DEFENDANT TREDEGAR CORPORATION'S
### REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
### OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

Michael C. Ledley, Esq.
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300

November 8, 2011

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT.................................................................................................... 4

I.    The Second Circuit's Decision In *Haynes* Compels Dismissal................... 4

II.    The Underlying Claim Against Exxon Is A Retained Liability ................. 8

III.    New York Law and the Full Faith and Credit Clause of the Constitution Prohibit Application of New York Law, To the Extent It Conflicts With the Pennsylvania Workers Compensation Act ................................. 10

IV.    The Failure to Cooperate Claim Fails as a Matter of Law ........................ 16

CONCLUSION ................................................................................................ 18

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Allstate Ins. Co. v. Hague,*
    449 U.S. 302 (1981) ...................................................................................14

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937, 1950, 1953 (2009) ..........................................................17

*Bell Atlantic Co. v. Twombley,*
    550 U.S. 544, 555 (2007) ...........................................................................17

*Bester v. Essex Crane Rental Corp.,*
    422 Pa. Super. 178, 619 A.2d 304 (Pa. Super. 1993) ..............................12

*Blue Cross & Blue Shield of N.J. v Philip Morris USA Inc.,*
    3 N.Y.3d 200 (2004) ..................................................................................13

*Carroll v. Lanza,*
    349 U.S. 408 (1955) ...................................................................................15

*Cevasco v. AMTRAK,*
    606 F. Supp. 2d 401 (S.D.N.Y. 2009) .......................................................7

*Cooney v. Osgood,*
    81 N.Y.2d 66 (1993) ..................................................................................11

*George A. Fuller Co. v. Fischbach & Moore, Inc.,*
    180 N.Y.S.2d 589 (1st Dep't 1958) ............................................................7

*Haynes v. Kleinewefers & Lembo Corp.,*
    921 F.2d 453 (2d Cir. 1990) .............................................................1-2, 4-6

*Koch Ind., Inc. v. Aktiengesellschaft,*
    727 F. Supp. 2d 199 (S.D.N.Y. 2010) .......................................................5

*Kruzits v. Okuma Machine Tool, Inc.,*
    40 F.3d 52 (3d Cir. 1996) ..........................................................................12

*Kurek v. Port Chester Housing Authority,*
    223 N.E.2d 25 (1966) ..................................................................................7

*Lefkowitz v. Bank of N.Y.,*
    676 F. Supp. 2d 229 (S.D.N.Y. 2009) .....................................................17

*Lehman Bros. Comm. Corp. v. Minmetals Intern. Non-Ferrous Metals Trading Co.*,
    179 F. Supp. 2d 118 (S.D.N.Y. 2000) ............................................................... 11

*Levine v. Shell Oil Co.*,
    28 N.Y.2d 205, 269 N.E.2d 799 (1971) ............................................................ 7

*Liff v. Consol. Edison Co. of N.Y.*,
    286 N.Y.S.2d 354 (1968) ................................................................................. 7

*Marine Midland Bank, N.A. v. United Missouri Bank, N.A.*,
    223 A.D. 2d 119, 643 N.Y.S.2d 528 (1st Dep't 1996) ........................... 11, 13

*McIlvaine Trucking, Inc. v. W.C.A.B.*,
    570 Pa. 662 (2002) ........................................................................................ 12

*Pacific Employers Ins. Co. v. Industrial Accident Comm'n*,
    306 U.S. 493 (1939) ....................................................................... 3, 13-14, 15

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) .................................................................................. 13-14

*Regal Consruction Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
    930 N.E.2d 259, 262 (N.Y. 2010) ................................................................ 7-8

*Roach v. McGuire & Bennett, Inc.*,
    146 A.D.2d 89, 539 N.Y.S.2d 138 (3d Dep't 1989) ..................................... 12

*Rolon v. U.S. Amada, Ltd.*, No. 95 Civ. 6231,
    1997 U.S. Dist. LEXIS 18315 (S.D.N.Y. Nov. 13, 1997) .............................. 7

*Ruhland v. John W. Cowper Co.*,
    72 A.D.2d 907, 422 N.Y.S.2d 182, 183 (4th Dep't 1979) *aff'd* 52 N.Y.2d 756 (1980) ...... 4

*Suazo v. Maple Ridge Assoc. LLC*,
    2011 N.Y. App. Div. LEXIS 4636 (1st Dep't June 7, 2011) ................. 1, 4-5, 8

*Sun Oil Co. v. Wortman*,
    486 U.S. 717 (1988) ............................................................................. 3, 13-14

*Smith v. Meadow Mills, Inc.*,
    60 F. Supp. 2d 911 (E.D. Wis. 1999) ............................................................. 5

*Thomas v. Washington Gas Light Co.*,
    448 U.S. 261 (1980) ................................................................................. 15, 16

*Vitty v. D.C.P. Corp,*
    633 A.2d 1040 (N.J. Super. 1993) ........................................................................ 8

*XL Specialty Insurance Co. v. Agoglia*, Nos. 08 Civ 3821, 08 Civ. 4196, 08 Civ 5252,
    2009 U.S. Dist. LEXIS 36601 (S.D.N.Y. March 2, 2009) .................................... 8

*Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*,
    84 N.Y.2d 309, 318 (1994) ....................................................................... 11, 13

## Rules and Statutes

Fed. R. Civ. P. 12(b)(6) ....................................................................................... 1, 18

77 Pa. Stat. Ann. § 1 .............................................................................................. 12

77 Pa. Stat. Ann. § 481 .......................................................................................... 12

N.Y. Gen. Oblig. L. § 5-1401 ........................................................................... 13, 15

## Other Authorities

Restatement (Second) of Conflict of Laws § 187 ...................................................... 11

Plaintiff Tredegar Corporation ("Tredagar") respectfully submits this Reply Memorandum of Law in Further Support of its Motion to Dismiss the Amended Complaint of Exxon Mobil Corporation ("Exxon") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

This dispute arises out of Exxon's claim for contractual indemnification for its own allegedly negligent conduct under asset purchase agreement (the "Agreement") pursuant to which Tredegar acquired Exxon's film manufacturing business. There is no dispute as to the applicable legal standard: Exxon's claims fail as a matter of law unless the Agreement demonstrates an "unmistakable intent" for Tredegar to indemnify Exxon for employee injuries arising out of Exxon's own alleged negligence, *i.e.*, unless the Agreement unambiguously requires Tredegar to pay. The inescapable fact – demonstrated by Exxon's pages of labored argumentation – is that the Agreement does not unambiguously entitle Exxon to indemnification. In fact, Tredegar respectfully submits that the Agreement unambiguously assigns the liability at issue to Exxon. But the Court need not be persuaded that the Agreement unambiguously favors Tredegar in order to grant Tredegar's motion because, under New York law, any ambiguity "compels dismissal." *Suazo v. Maple Ridge Assoc. LLC*, 2011 N.Y. App. Div. LEXIS 4636, at * 4 (1st Dep't June 7, 2011).

Thus, the issue for the Court is whether Exxon's alleged liability to Leo Leinheiser, the underlying tort plaintiff, arguably "arises out of" (in whole or in part) events before Tredegar's acquisition of the Mar-Lin Facility, when the alleged negligence occurred. The Second Circuit decision in *Haynes v. Kleinewefers & Lembo Corp.*, 921 F.2d 453 (2d Cir. 1990), is dispositive on this issue. *Haynes* makes clear, on these exact facts, that the relevant event that a post-

---

[1]  Capitalized terms not defined herein have the same meaning as set forth in Tredegar's moving brief.

acquisition liability "arises out of" is the pre-acquisition tortious conduct and not the post-acquisition accident or injury. *Haynes* therefore compels dismissal of the Complaint. Exxon's attempt to distinguish *Haynes* relies on a serious mischaracterization of the court's reasoning, and Exxon's reliance on factually dissimilar cases (many of which involve contracts that expressly provide for indemnification for the indemnitees' own negligence) is unavailing. Even if the Court were to apply Exxon's "but for" interpretation of "arising out of," the liability at issue would arise out of <u>both</u> the pre-acquisition tortious conduct <u>and</u> the post-acquisition injury, rendering the Agreement internally inconsistent and, therefore, ambiguous. Accordingly, even under Exxon's proffered interpretation of the relevant language, Exxon could not demonstrate the requisite "unmistakable intent" and Tredegar would be entitled to dismissal of the Complaint.

Moreover, the Agreement cannot be read as unambiguously requiring indemnification because Exxon's alleged liability at least <u>arguably</u> (and, Tredegar submits, unambiguously) falls within the definition of Retained Liabilities. Section 1.67 of the Agreement provides, among other things, that "[n]otwithstanding anything to the contrary contained herein" the Retained Liabilities shall include "any liability or obligation arising out of . . . any legal proceeding commenced after the Closing Date to the extent it arises out of, or relates to, any occurrence or happening before the Closing Date." The underlying tort case against Exxon was commenced after the Closing Date and, as alleged by Mr. Leinheiser, his claim against Exxon arises out of and is related to alleged conduct by Exxon before the Closing Date. It is, therefore, a Retained Liability. Accordingly, even if the liability also could be construed as an Assumed Liability (and Tredegar submits it cannot), the agreement would be ambiguous.

Although the Court need not reach this issue, if the Court were to conclude that the Agreement unambiguously requires indemnification, the Agreement would be unenforceable under the Pennsylvania Workers Compensation Act. Exxon does not dispute that the

Pennsylvania statute, if applicable, would preclude its contractual indemnification claim but contends that the Court must apply New York law. However, New York choice of law rules require New York courts to defer to another state's "sufficiently compelling" state interest where New York's interest is weak. Similarly, the Full Faith and Credit Clause requires a forum state to apply a foreign state's law when the forum state has insufficient contacts with the dispute and therefore is not "competent to legislate" on the issue.

Although this dispute appears to present an issue of first impression (in New York courts or any other jurisdiction), application of well-settled principals of New York law and Supreme Court jurisprudence to the issue requires the Court to resolve any conflict between New York law and the Pennsylvania statute in favor of the Pennsylvania statute. Exxon's opposition misapplies New York choice of law rules and proffers an incomplete analysis of the constitutional issue. By focusing exclusively on the expectations of the parties, Exxon ignores the principles of federalism and inter-state comity underlying the Full Faith and Credit Clause, which require courts "to give both the forum State and other interested States the legislative jurisdiction to which they are entitled." *Sun Oil Co. v. Wortman*, 486 U.S. 717, 727 (1988). Regardless of whether the parties chose New York law to govern the interpretation of the Agreement, New York's interest in providing a forum for sophisticated commercial disputes does not entitle it to reach across state lines and allocate liabilities arising out of workplace injuries occurring in Pennsylvania that are exclusively within the "legislative jurisdiction" of Pennsylvania and about which New York simply is not "competent to legislate." *Id.*; *Pacific Employers Ins. Co. v. Industrial Accident Comm'n*, 306 U.S. 493, 501 (1939).

Finally, Exxon's newly minted breach of contract claim for Tredegar's alleged "failure to cooperate" fails as a matter of law for the reasons set forth in Tredegar's moving papers and therefore should be dismissed.

## ARGUMENT

### I.   THE SECOND CIRCUIT'S DECISION IN *HAYNES* COMPELS DISMISSAL

As set forth in Tredegar's moving brief, New York law requires that contractual

indemnification provisions be "strictly construed" and provides that a claim for contractual

indemnity for a party's own negligence will fail unless "the contract demonstrates an

'unmistakable intent' to indemnify the negligent party." *Haynes*, 921 F.2d at 456.  In other

words, "the intent to assume such a role" with respect to the indemnitee's own negligence must

be "sufficiently clear and unambiguous." *Suazo*, 2011 N.Y. App. Div. LEXIS 4636, at *4.  If the

Agreement "is ambiguous and the intent of the parties cannot be ascertained from the four

corners of the document . . . such determination, in and of itself, <u>compels dismissal</u>" of the

contractual indemnity claim. *Suazo*, 2011 N.Y. App. Div. LEXIS 4636, at *4 (emphasis added);

*see also Ruhland v. John W. Cowper Co.*, 72 A.D.2d 907, 422 N.Y.S.2d 182, 183 (4th Dep't

1979) ("The mere existence of more than one interpretation requires a finding that

indemnification was not the unmistakable intent of the parties.") *aff'd* 52 N.Y.2d 756 (1980).

*Haynes* remains the authoritative statement of New York law on this issue in this Circuit.

Exxon does not dispute that this is the applicable standard.  In fact, in its opposition to

Tredegar's motion to dismiss the original Complaint, Exxon freely acknowledged the applicable

New York standard.  Exxon Mem. of Law in Opp. To Tredegar's Motion to Dismiss at 23, 25-

26.  However, Exxon's current opposition brief conspicuously – and quite tellingly – omits any

reference to the well-settled "unmistakable intent" test.  With good reason.  The Agreement

simply cannot be read <u>unambiguously</u> to require Tredegar to indemnify Exxon for its own

allegedly negligent pre-acquisition conduct.  As discussed below, Exxon's liability to Mr.

Leinheiser is unambiguously (and at least arguably) a Retained Liability and therefore allocated

to Exxon "[n]otwithstanding anything to the contrary" in the Agreement.  Agreement, § 1.67.

Even if that liability could also be construed as an Assumed Liability (and it cannot), the Agreement would be at worst ambiguous. As the First Department reiterated in June of this year, any ambiguity in the contract "compels dismissal" of the contractual indemnity claim. *Suazo*, 2011 N.Y. App. Div. LEXIS 4636, at \*4. Exxon's claim for contractual liability therefore fails as a matter of law and must be dismissed.

Moreover, *Haynes* is nearly an exact analog of the present dispute and compels dismissal of the Complaint. Like this case, *Haynes* involved (i) a sale of a business; (ii) a purchase and sale agreement that allocated liabilities between the purchaser and seller depending on how the liability "arose"; (iii) an injury allegedly caused by the seller's pre-sale negligence that occurred many years after the sale; and (iv) a claim by the seller for contractual indemnification from the purchaser. *Haynes*, 921 F.2d at 454-56. Coincidentally, even the type and circumstances of the injury suffered by the underlying tort plaintiff in *Haynes* is similar to the present case, as both tort plaintiffs were allegedly injured when their respective arms were caught in industrial machines. *Id.* at 454. Critically, when the Second Circuit applied the "arising" language, it looked to the alleged pre-sale negligence of the seller (*i.e.*, the "negligent modification of a calendar machine") as the relevant event for determining whether the purchaser assumed the liability, and not to the injury, itself. *Id.* at 4571; *see also Koch Ind., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199, 212 (S.D.N.Y. 2010) (seller responsible for liability arising out of pre-sale conduct); *Smith v. Meadow Mills, Inc.*, 60 F. Supp. 2d 911 (E.D. Wis. 1999) (same). Following the same reasoning in this case, it is clear that the relevant "event" out of which Exxon's liability arises is Exxon's alleged pre-sale negligence. Therefore the Agreement allocates that liability to Exxon. *See, e.g.,* Agreement, § 1.67(v) (stating that Retained Liabilities include legal proceedings commenced after the Closing Date "to the extent it arises out or relates to any occurrence or event happening before the Closing Date") (emphasis added).

Exxon tries to distinguish *Haynes* based on the fact that the contract provision at issue was labeled "assumption of liabilities" and not "indemnification." Plaintiff's Memorandum of Law in opposition to Defendant's Motion to Dismiss the Amended Complaint ("Opp. Br.") at 11-12. However, the title of the provision had no relevance to the court's reasoning. It is clear that if the "assumption of liabilities" provision had unambiguously allocated liability to the purchaser, the *Haynes* court would have sustained the indemnification claim regardless of whether the word "indemnification" appeared in the contract. In context, the *Haynes* court's statement that the seller "does not contend that the language at issue expressly entitles it to indemnification" obviously referred to the absence of any language expressly allocating liability for the seller's own negligence and not the absence of any provision labeled "indemnification." *Id.* at 457.

Notably, the contract in *Haynes* was in at least one important respect more favorable to the seller than the Agreement here because it allocated liabilities to the purchaser whether they arose pre- or post-sale so long as they arose in "the ordinary course of business." *Id.* Although the Second Circuit found that the broader contract language in *Haynes* <u>could</u> be construed so as to require indemnification, it held that the contract nevertheless lacked the requisite "unmistakable intent." Exxon's attempt to distinguish *Haynes* based on the "ordinary course" language is unavailing. The critical element of the *Haynes* case is that the court analyzed whether the "negligent modification of a calendar machine" occurred in the ordinary course of business and not whether the injury to the tort plaintiff occurred in the ordinary course of business. *Id.* at 457. There was no question that the injury arose in the ordinary course of the company's business. Thus, if the relevant event for purposes of the "arising" language was the accident or injury, the court would have had to sustain the seller's indemnification claim.

The authorities on which Exxon relies are factually inapposite. Tellingly, Exxon does not

cite to a single case involving allocation of liabilities in connection with the sale of a business, and Tredegar is not aware of any such cases imposing on the purchaser the liability for the seller's pre-sale conduct.  Nor do the cases cited by Exxon involve contracts with mutual, and arguably conflicting, indemnifications provisions in which various categories of liability were allocated between the parties.  Thus, Exxon relies on a case interpreting "arising out of" in a contractor agreement with Amtrak containing an unqualified indemnification provision in which the contractor assumed all liability relating to its work on the project "irrespective of any negligence or fault of Amtrak." *Cevasco v. AMTRAK*, 606 F. Supp. 2d 401, 405-06 (S.D.N.Y. 2009) (applying District of Columbia law) (*citing George A. Fuller Co. v. Fischbach & Moore, Inc.*, 180 N.Y.S.2d 589, 591 (1st Dep't 1958) (holding that subcontractor was required to indemnify contractor for injuries arising out of contractor's negligence where contract provided for indemnification "whether such injuries to persons are due or claimed to be due to *any negligence* of the Sub-Contractor, the Owner, the General Contractor, his or their employees or agents or *any other person*") (emphasis in original).[2]  Exxon also cites insurance cases employing broad interpretations of the phrase "arising out of." *Regal Consruction Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 930 N.E.2d 259, 262 (N.Y. 2010) (requiring insurer was obligated to defend and indemnify a contractor for an injury on the contractor's work site under a

---

[2]  Notably, the only cases in which New York courts have required a party to indemnify an indemnitee for its own negligence that did not expressly cover the indemnitee's involved absolute, unqualified general indemnification provision allocating all potential liability to the indemnitor. *See, e.g., Levine*, 269 N.E.2d at 801 (lease provided for indemnification for "any and all claims, suits, loss, cost and liability . . . in connection with the [leased] premises . . . or the condition, maintenance, possession or use thereof or the operations thereon"); *Liff v. Consol. Edison Co. of N.Y.*, 286 N.Y.S.2d 354, 355-56 (1968) (contract required indemnification for "any and all liability including any and all expense, legal or otherwise"); *Kurek v. Port Chester Housing Authority*, 223 N.E.2d 25, 27 (N.Y. 1966) (contract required party to indemnify and hold harmless "against any and all claims and demands of . . whatsoever kind or nature"); *Rolon v. U.S. Amada, Ltd.*, No. 95 Civ. 6231, 1997 U.S. Dist. LEXIS 18315, at *18 (S.D.N.Y. Nov. 13, 1997) (contract for sale of machine required purchaser to "indemnify, defend and save [seller] harmless against and from all liability, claims, demands, costs, losses, injuries or expenses, whatsoever and howsoever arising in connection with [the machine]").

policy providing coverage "with respect to liability arising out of [Regal's] ongoing operations");

*XL Specialty Insurance Co. v. Agoglia*, Nos. 08 Civ 3821, 08 Civ. 4196, 08 Civ 5252, 2009 U.S. Dist. LEXIS 36601, at *27-28 (S.D.N.Y. Mar. 2, 2009) (holding that "arising out of" implies a "but for" causality test). Not only are these cases factually inapposite, but if anything they <u>weaken</u> Exxon's case because, as alleged by Mr. Leinheiser, Exxon's negligence was also a "but for" cause of his injury. Moreover, the phrase "arising out of" also appears in the definition of Retained Liabilities. *See* Agreement, § 1.67(v) (allocating liability to Exxon for any liability "to the extent it arises out of, or relates to, any occurrence or event happening before the Closing Date"). Accordingly, Exxon's broad interpretation of "arising out of" does not alter the fact that the Agreement is, at worst, ambiguous as to whether Mr. Leinheiser's liability arose out of events before the Closing Date or after the Closing Date (or both), and any such ambiguity "compels dismissal." *Suazo* 2011 N.Y. App. Div. LEXIS 4636, at * 4.[3]

## II.   THE UNDERLYING CLAIM AGAINST EXXON IS A RETAINED LIABILITY

The Agreement does not unambiguously require Tredegar to indemnify Exxon for its pre-sale conduct for a more fundamental reason: liabilities arising out of Exxon's pre-sale conduct are defined as Retained Liabilities. As described in Tredegar's opening brief, the Agreement provides, as a default, that all Exxon liabilities are "Retained Liabilities" unless they fall within the specific definition of Assumed Liabilities:

> all liabilities and obligations of Seller, whether such liabilities and obligations relate to payment, performance or otherwise, arise before or after the Closing, are matured or unmatured, are known or unknown, are contingent or non-contingent, are fixed or undetermined, or are present, future or otherwise, other than the Assumed Liabilities.

Agreement, § 1.67. In addition to this general definition and "without limiting" (*i.e.*, narrowing

---

[3]   The New Jersey Superior Court's decision in *Vitty v. D.C.P. Corp*, 633 A.2d 1040 (N.J. Super. 1993) is not relevant all. *Vitty* involved liability for the death of contractor's employee caused by a drunk driver.

the scope of) the general definition, the Agreement listed certain specific categories of liabilities that "[n]otwithstanding anything to the contrary" in the Agreement "shall be considered Retained Liabilities." *Id.* In other words, the specifically identified categories listed in Section 1.67 were intended to be Retained Liabilities regardless of whether they might also be construed as Assumed Liabilities.

One of the specifically identified categories of Retained Liabilities is "any liability or obligation. . . commenced after the Closing Date to the extent it arises out of, or relates to, any occurrence or event happening before the Closing Date." *Id.*, § 1.67(v). Mr. Leinheiser's underlying claim against Exxon clearly (and at least <u>arguably</u>) "arises out of" and/or "relates to" Exxon's alleged pre-sale negligent acts. Accordingly, that claim is a Retained Liability "[n]otwithstanding anything to the contrary" in the Agreement. *Id.* Exxon argues Section 1.67(v) does not here because Exxon's allegedly negligent acts are no "events" or "occurrences." According to Exxon, "[t]he Underlying Litigation is based on a single event: Mr. Leinheiser's April 20, 2007 accident." However, that is demonstrably false. Mr. Leinheiser's claim was based on <u>both</u> his accident and the allegedly negligent conduct by Exxon. Compl., Ex. B, ¶¶ 35-37. The Leinheiser Complaint specifically alleges that Exxon's negligence – and not an event, act or occurrence occurring after Exxon sold the Machine – was the proximate cause of Mr. Leinheiser's injury. *Id.* ¶ 37. Exxon offers no authority for its assertion that its negligent act is not an "event" or "occurrence." Exxon cites other categories of Retained Liabilities that allocate liability for Exxon's pre-acquisition conduct in various other contexts, but those provisions simply confirm and reinforce the parties' intent to allocate liability for pre-acquisition conduct to Exxon and liability for post-acquisition conduct to Tredegar.

Finally, Exxon argues that treating the Leinheiser claim as a Retained Liability renders Tredegar's indemnification obligation with respect to the liabilities relating to "conduct of the

Business" after the Closing Date meaningless.  Opp. Br. at 18; *see* Agreement, § 4.2 and

Schedule 4.2 at ¶ 4.  Not so.  For example, although it is true that Exxon likely could not be held

liable in connection with the "conduct of the Business" after the Closing Date, there is nothing to

prevent a plaintiff from naming Exxon (a conspicuously "deep pocket") as a defendant in such a

suit.  Tredegar's indemnification obligation covers litigation expenses.  Agreement, § 1.67.

Thus, Tredegar's obligation to indemnify Exxon for liability relating to the "conduct of the

Business" after the Closing Date protects Exxon from the cost of nuisance suits relating solely to

the post-acquisition conduct of the business.

In any event, Exxon cannot reasonably dispute that Mr. Leinheiser's claim at least

arguably falls within the scope of Section 1.67(v) of the Agreement and therefore constitutes a

Retained Liability.  So even if the underlying tort claim could be construed as an Assumed

Liability, Exxon's indemnification claim would nevertheless fail because the underlying claim is

also a Retained Liability, and its specific enumeration as a Retained Liability trumps the

definition of Assumed Liability.  Accordingly, Exxon cannot avoid the conclusion that its

settlement payment to Mr. Leinheiser is, at least arguably, a Retained Liability and therefore the

Agreement cannot demonstrate an "unmistakable intent" for Tredegar to indemnify Exxon for

that liability.

## III.   NEW YORK LAW AND THE FULL FAITH AND CREDIT CLAUSE PROHIBIT APPLICATION OF NEW YORK LAW, TO THE EXTENT IT CONFLICTS WITH THE PENNSYLVANIA WORKERS COMPENSATION ACT

For the reasons set forth above, the Court need not reach the question of how to resolve a

conflict between New York law and the Pennsylvania Workers Compensation Act because there

is no conflict on these facts and Tredegar is entitled to dismissal of the Complaint under either

New York law or the Pennsylvania statute.  Nevertheless, should the Court find the requisite

"unmistakable intent" in the Agreement under New York law, this case would present an issue of

first impression. No court appears to have considered whether a forum state can apply its own law where it has no interest in the dispute, other than an interest in providing the rule of decision, when doing so would violate an important public policy of a more-interested state. *See Lehman Bros. Commercial Corp.*, 179 F. Supp. 2d at 137. Tredegar respectfully submits, on these facts, that the Court would be required to defer to the Pennsylvania statute under both New York law and the Full Faith and Credit Clause. Exxon's argument to the contrary misapplies New York choice of law rules and relies on an incomplete analysis of the constitutional issue.

Exxon's mechanical application of Restatement (Second) of Conflict of Laws §187 to require an extensive "grouping of contacts" analysis (the result of which would likely be indeterminate on these facts) is inconsistent with New York law. *See* Opp. Br. at 9-13. Under New York law, "even in contract cases, where grouping of contacts is the primary analytical tool, in certain instances the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests, and therefore should be considered." *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 318 (1994). Moreover, "in a proper case, a foreign State's sufficiently compelling public policy could preclude an application of New York law otherwise indicated by the grouping of contacts analysis, particularly where New York's policy is weak or uncertain." *Id.*; *see also Marine Midland Bank, N.A. v. United Missouri Bank*, N.A., 223 A.D. 1st 119, 123, 643 N.Y.S.2d 528, 531 (1st Dep't 1996) (choice of law provision may be disregarded "where the issue is of such overriding concern to the public policy of the other jurisdiction as to override the intent of the parties and the interest of this state in enforcing its own policies").

That is precisely the case here. There can be no doubt that Pennsylvania has a strong policy interest, as expressed in its workers compensation statute and interpreting case law, in preserving a Pennsylvania employer's immunity from liability for employee injuries occurring in

Pennsylvania. *Cooney v. Osgood*, 81 N.Y.2d 66, 75 (1993) ("to deny a person the immunity granted by a worker's compensation statute of a given state would frustrate the efforts of that state to restrict the cost of industrial accidents and to afford a fair basis of predicting what these costs will be"); *Roach v. McGuire & Bennett, Inc.*, 146 A.D. 2d 89, 93, 539 N.Y.S.2d 138, 140-41 (3d Dep't 1989) ("Pennsylvania's legislature has clearly and unequivocally expressed that state's interest in having its workers' compensation law apply to all industrial accidents that occur within its borders."); *Bester v. Essex Crane Rental Corp.*, 422 Pa. Super. 178, 619 A.2d 304 (Pa. Super. 1993); *McIlvaine Trucking, Inc. v. W.C.A.B.*, 570 Pa. 662, 672 (2002) (applying Pennsylvania statute to in-state injury notwithstanding choice of law provision).[4]

Moreover, the Pennsylvania Workers Compensation Act expressly provides (1) that it applies to all injuries occurring in Pennsylvania and (2) where an employee injury is caused by a third-party, that third-party may not seek contractual indemnification from the employer unless the contract expressly provides for it. 77 Pa. Stat. Ann. §§ 1, 481. In light of the foregoing authorities, Exxon's assertion that Pennsylvania has no "interest in protecting employers from contract-based suits brought by third parties in other states" is simply wrong.

In contrast, New York has no legitimate policy interest in allocating liability for work place injuries occurring in Pennsylvania, particularly when no New York resident or property is involved. Moreover, even if New York had an interest in this issue, it has no strong policy favoring claims for contractual indemnification for the indemnitee's own tortious conduct that

---

[4] The Third Circuit's decision in *Kruzits v. Okuma Machine Tool, Inc.*, is not to the contrary. 40 F.3d 52 (3d Cir. 1996). Although similar in certain respects to the present case, the underlying tort plaintiff in *Kruzits* did not allege that the third party "caused his personal injury" and therefore the Pennsylvania workers compensation statute did not apply. *Id.* at 56; 77 Pa. Stat. § 481(b) (applying to employee injury "caused by a third party"). Therefore, the plaintiff's claim for indemnification in *Kruzits* had "no effect on the employer's rights and obligations under the [Pennsylvania Workers Compensation Act]" and "no strong public policy issues [were] infringed." Here, in contrast, Mr. Leinheiser specifically alleges that Exxon's negligence was the proximate cause of his injury and, thus, Exxon's indemnification claim falls squarely within the scope of Section 481(b) of the Pennsylvania statute.

would be infringed by application of the Pennsylvania statute.  To the contrary, as discussed above, such claims are disfavored under New York law and are only permitted where the contract demonstrates an "unmistakable intent" to provide for indemnification.  Thus, Pennsylvania's strong public policy is "sufficiently compelling" and precludes application of New York law.  *Zurich Ins. Co.* 84 N.Y.2d at 318.

Exxon's reliance on New York General Obligations Law § 5-1401 is misplaced.  First, nothing on the face of that provision suggests that it was intended to abrogate the common law rule that choice of law provisions must give way to another state's "overriding interest in application of its own public policy."  *See Marine Midland*, 643 N.Y.S.2d at 531.  Tredegar acknowledges that a number of district court cases have so held, *see* Opp. Br. at 22-23 (citing cases); Tredegar Moving Br. at 19 n. 7, but that interpretation has not been adopted in any decision that is binding on this Court.  Moreover, Tredegar respectfully submits that those decisions are inconsistent with the fundamental canon of statutory construction that statutes in derogation of the common law will be strictly construed.  *See generally Blue Cross & Blue Shield of N.J. v Philip Morris USA Inc.*, 3 N.Y.3d 200, 206 (2004).

In any event, interpreting General Obligations Law § 5-1401 to require application of New York law, on these facts, would violate the Full Faith and Credit Clause.  New York State's interest "in enforcing parties' contractual selections of New York law" – the only New York interest identified by Exxon – does not entitle New York to reach across state lines and allocate liabilities arising out of workplace injuries occurring in Pennsylvania that are exclusively within the "legislative jurisdiction" of Pennsylvania and about which New York is not "competent to legislate."  *Sun Oil Co.*, 486 U.S. at 727; *Pacific Employers*, 306 U.S. at 501.

Exxon properly cites the standard set forth by the Supreme Court in *Phillips Petroleum Co. v. Shutts*: "for a State's substantive law to be selected in a constitutionally permissible

manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." 472 U.S. 797, 818 (1985) (*quoting Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312-313 (1981) (plurality opinion)). Exxon then argues that "[a]pplication by a state of its own laws is neither arbitrary nor fundamentally unfair when the parties expected (and indeed agreed) that it would, or could, apply." Opp. Br. at 34. As an initial matter, there is nothing in the Agreement to suggest that the parties expected any law other than the Pennsylvania Workers Compensation Act to apply to employee injuries at the Mar-Lin Facility. Agreement, § 4.5.1. In any event, Exxon's argument only addresses the "unfairness" component of the *Allstate* test and ignores the federalism component that requires that the forum state have "state interests" such that its choice of law is not "arbitrary."

Fairness is not the only – or, indeed, the principal – purpose served by Full Faith and Credit Clause. As the Supreme Court noted in *Phillips Petroleum*, the Full Faith and Credit Clause "require[s] the forum to respect the laws and judgments of other States, subject to the forum's own interests in furthering its public policy." *Phillips Petroleum*, 472 U.S. 819 (holding that decision of Kansas court applying Kansas law to class action violated the Full Faith and Credit Clause because Kansas lacked sufficient interests with respect to claims of non-resident plaintiffs) (*citing Allstate*, 449 U.S. at 335-36 (Powell, J., dissenting)). Thus, the purpose of the Full Faith and Credit contacts analysis is "to give both the forum State and other interested States the legislative jurisdiction to which they are entitled" and to "delimit spheres of state legislative competence." *Sun Oil Co. v. Wortman*, 486 U.S. 717, 727 (1988). Therefore, a forum state may substitute its own law for the statutory law of another state only if the subject matter is one in which the forum state has some legitimate interest and is therefore "competent to legislate." *Sun Oil Co.*, 486 U.S. at 722 (*citing Pacific Employers*, 306 U.S. at 501).

The only New York interest identified by Exxon is the desire to provide a forum and choice of law for sophisticated commercial disputes.[5]  However, where (as here) New York has no connection or substantive interest whatsoever in the outcome of the issue in dispute, it is not "competent to legislate" on that issue, particularly in the face of a sufficiently important public policy of another state with more significant contacts.  "Full faith and credit does not . . . enable one state to legislate for the other or to project its laws across state lines so as to preclude the other from prescribing for itself the legal consequences of acts within it."  *Pacific Employers*, 306 U.S. at 504.

In *Pacific Employers*, the Supreme Court held that one state could not, by statute, impose the limits of its workers compensation regime on another state with respect to injuries occurring within that state.  Similarly, applying General Obligations Law § 5-1401 to require application of New York law here would permit New York to reach across state lines and infringe on Pennsylvania's ability to legislate regarding worker injuries within its borders.  That would only be permissible under the Full Faith and Credit Clause if New York had some sovereign interest in the outcome of the dispute.  It does not.  For New York to seek to apply its laws with respect to issues that are solely internal to other states, and with respect to which New York has no sovereign interest, would amount to a "policy of hostility to the public Acts" of other States, which the Full Faith and Credit Clause is intended to prevent.  *Carroll v. Lanza*, 349 U.S. 408, 413 (1955); *see also Thomas v. Washington Gas Light Co.*, 448 U.S. 261, 272 (1980) (describing the purpose of the Full Faith and Credit Clause as the prevention of "parochial entrenchment on

---

[5]  Exxon also appears to suggest that New York has an interest in allocating the contractual liability for Mr. Leinheiser's injury because the $20 million in assets acquired by Tredegar in the transaction, which consisted principally of two plants located in Pennsylvania and Illinois, also included (1) certain inventory stored in 12 warehouses, only one of which was located in New York and (2) certain software patents that Exxon used in facilities in New York, although Tredegar did not acquire the New York facilities.  Opp. Br. at 25-26, 27, 35.  That Exxon is forced to rely on assets constituting such an insignificant fraction of the overall transaction for any contact with New York State underscores New York's utter lack of legitimate state interests in this dispute.

the interests of other States").[6]

## IV.   THE FAILURE TO COOPERATE CLAIM FAILS AS MATTER OF LAW

Exxon's indignant complaints about Tredegar's so-called "failure to cooperate" ring

hollow.  If Tredegar's conduct was so "egregious" (as Exxon alleges), one wonders why Exxon

failed to include the "failure to cooperate" claim in its original Complaint?  The only reasonable

conclusion is that, having heard the Court express its initial view that the indemnification

provisions in the Agreement are ambiguous, Exxon realized that it would need to assert another

claim if it hoped to avoid dismissal of the Amended Complaint in its entirety.  In any event, the

failure to cooperate claim is not supported by the terms of the Agreement and contains no factual

allegations to support a plausible claim that Exxon was damaged.  Moreover, Exxon asserts that

Tredegar's alleged motive for its "egregious" conduct was its "desire to recoup its workers'

compensation lien," but Exxon never explains what that means or how imposing greater liability

on Exxon (and increasing the value of Exxon's indemnification claim against Tredegar) was

somehow supposed to benefit Tredegar.

As discussed in Tredegar's moving brief, the provisions of the Agreement on which

Exxon relies, Sections 12.6, 12.7 and 15.3, simply do not apply in this context.  The Leinheiser

claim did not relate to financial accounting or reporting, tax liabilities or litigation or (as

discussed above) the Assumed Liabilities, and therefore it falls outside the scope of Sections 12.6

and 12.7.  Section 15.3 merely requires the parties to cooperate in the exercise of their

---

[6]   Exxon's out of context citation to the *Thomas* court's statement that "a state's interest in limiting the potential liability of business within the State is not of controlling importance" is highly misleading. Opp. Br. at 36.  In context, it is clear that the Supreme Court meant that one state's interest in limiting the liability of businesses is trumped by another state's interest in providing compensation to its own resident who was injured while working for a business located in that same state.  *Thomas*, 448 U.S. at 280. Nothing in *Thomas* suggests that Pennsylvania's interest in regulating injuries suffered by its own residents that occur within Pennsylvania would be trumped by New York's interest in providing the rule of decision in commercial disputes involving other states' domestic affairs that are entirely unrelated to New York.

obligations under the Agreement, and therefore any breach of Section 15.3 must be premised on some other, independent obligation provided in the Agreement. Exxon does not identify any other obligation under the Agreement with respect to which Tredegar allegedly failed to cooperate. Moreover, even if Leinheiser claim did fall within the scope of some obligation to cooperate, Tredegar would only be obligated to act reasonably. Agreement, § 12.6 ("shall cooperate in all <u>reasonable</u> respects"), § 12.7 ("provide <u>reasonable</u> access"). Inasmuch as Exxon was threatening Tredegar with litigation at the time, Exxon could not reasonably have expected Tredegar to go out of its way to provide assistance.

In any event, Exxon has not alleged (and, indeed, cannot allege) any plausible damages resulting from Tredegar's alleged lack of cooperation. Exxon asserts that "it is certainly plausible that Exxon was prejudiced in its defense"; "it is plausible that Exxon incurred unnecessary and additional expenses"; "it is plausible that if it had access, Exxon could have discovered documents pertinent to its dispositive motion or its settlement posture"; that if Exxon had interviewed Tredegar witnesses it "might have received" information helpful to its case; and "with Tredegar's cooperation, it is plausible that Exxon would have paid less, or even nothing." Opp. B. at 41-42. But simply asserting, *ipse dixit*, that something is "plausible" does not make it so. In the absence of <u>any</u> factual allegations to support them, Exxon's statements about hypothetical damages are pure speculations that do not satisfy the *Twombley/Iqbal* pleading standard. *See generally Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950, 1953 (2009); *Bell Atlantic Co. v. Twombley*, 550 U.S. 544, 555 (2007); *Lefkowitz v. Bank of N.Y.*, 676 F. Supp. 2d 229, 265-66 (S.D.N.Y. 2009) (dismissing breach of contract claim for failure to plead plausible damages).[7] Moreover, if Exxon truly believed that Tredegar had information that was material to the

---

[7]  Notably, the two cases cited by Exxon for the proposition that it is not required to plead damages were issued prior to *Twombley* and *Iqbal*.

Leinheiser case, it would have served a document or deposition subpoena.  Had it done so and had Exxon otherwise pled a valid claim for breach, then the cost of that discovery might constitute plausible damages. Rank speculation about what might have happened, unsupported by any concrete facts, certainly does not.

## CONCLUSION

For the reasons set forth above and in its moving brief, Tredegar respectfully requests that Court issue an order dismissing the Amended Complaint with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated:   New York, New York
         November 8, 2011

**WOLLMUTH MAHER & DEUTSCH LLP**

By:   _____
         Michael C. Ledley

500 Fifth Avenue
New York, NY 10110
(212) 382-3300
mledley@wmd-law.com

*Counsel for Defendant Tredegar Corporation*