```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
EXXON MOBIL CORPORATION,

                Plaintiff,             OPINION

        -against-                      11 Civ. 2829 (MGC)


TREDEGAR CORPORATION,

                Defendant.

----------------------------------X

APPEARANCES:

        DRINKER, BIDDLE & REATH, LLP
        Attorneys for Plaintiff
        500 Campus Drive
        Florham Park, New Jersey 07932

        BY: Daniel B. Carroll, Esq.

        One Logan Square, Suite 2000
        Philadelphia, Pennsylvania 191003

        BY: Gregory P. Miller, Esq.



        WOLLMUTH MAHER & DEUTSCH LLP
        Attorneys for Defendant
        500 Fifth Avenue
        New York, New York 10110

        BY: Michael C. Ledley, Esq.
```

**Cedarbaum, J.**

Exxon Mobil Corporation ("Exxon") sues Tredegar Corporation ("Tredegar") for breach of an Asset Purchase Agreement ("APA"). The amended complaint alleges that Tredegar failed to indemnify Exxon for a settlement in a Pennsylvania personal injury action, and that Tredegar failed to cooperate with Exxon's defense of the action in violation of the APA. Tredegar moves to dismiss under Fed. R. Civ. P. 12(b)(6). For the reasons that follow, Tredegar's motion is granted in part and denied in part.

## BACKGROUND

The following facts are set forth in the amended complaint and accepted as true for the purposes of the motion to dismiss. Exxon is a New Jersey corporation with its principal place of business in Texas. Tredegar is a Virginia corporation with its principal place of business in Virginia. On May 17, 1999 (the "Closing Date"), Tredegar acquired Exxon's film business, including a processing plant in Mar Lin, Pennsylvania, pursuant to the APA.

In April 2007, Leo Leinheiser, a maintenance mechanic at Tredegar's Mar Lin facility, severely injured his arm while cleaning an industrial cutting machine known as a "slitter." Tredegar paid Leinheiser workers' compensation benefits.

In April 2009, Leinheiser and his wife filed complaints against Exxon and several other entities, stating causes of

action under theories of strict liability, negligence, breach of warranty, and loss of consortium.  Exxon sent a notice of tender of defense and demand for indemnification to Tredegar in June 2009.  Tredegar declined to indemnify Exxon.

Exxon alleges that Tredegar's prior Assistant General Counsel, Randy Reaves, agreed to cooperate with Exxon in its defense of the underlying litigation.  For example, Exxon arranged to interview the employees that Tredegar intended to produce for deposition.  However, less than one week before the scheduled interviews, Tredegar's outside counsel, Alexander Palutis, informed Exxon that the interviews could not take place because Exxon and Tredegar had adverse interests in the matter.  The Tredegar employees revealed at their depositions that Tredegar had allowed counsel for the Leinheisers to participate at deposition preparation sessions.  In addition, Tredegar voluntarily granted one of the Leinheisers' experts access to the Mar Lin facility to inspect the slitter machine without notifying Exxon.

Exxon also alleges that Palutis repeatedly assured Exxon that it would have an opportunity to inspect several documents in Tredegar's possession without a subpoena.  Tredegar never provided the documents.  Similarly, in December 2010, Tredegar informed Exxon that it would provide an affidavit from an employee with knowledge of the accident.  After Exxon sent a

draft affidavit to Tredegar in February 2011, Tredegar informed Exxon by letter that it would not make its employees available for interviews or depositions.  By the time Exxon received the letter, discovery had closed.

In May 2011, the parties to the underlying litigation participated in a voluntary mediation.  Palutis appeared on behalf of Tredegar.  Exxon's co-defendants settled their disputes with the Leinheisers at the mediation, though Exxon did not.  The Leinheisers subsequently submitted a memorandum to the Court of Common Pleas of Philadelphia County in which they demanded $2,000,000 from Exxon to settle the litigation.  Exxon ultimately settled with the Leinheisers for $250,000, but Exxon and Tredegar were unable to resolve their dispute over liability for the settlement.

## DISCUSSION

On a motion to dismiss under Rule 12(b)(6), the factual allegations of the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff.  ECA and Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).  In addition to the allegations of the complaint, I may consider documents that are attached to or incorporated into the complaint by reference.  ATSI Commc'ns v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  To survive a motion to dismiss, a complaint must

"contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).

**I. Count I: Breach of the APA's Indemnification Provision**

The parties dispute whether, under the APA, liability for Exxon's settlement with the Leinheisers falls under Exxon's Retained Liabilities or Tredegar's Assumed Liabilities. If the settlement costs are an Assumed and not a Retained Liability, Tredegar is contractually bound to indemnify Exxon.

When a party claims that a duty to indemnify is imposed by contract, that contract must be "strictly construed" and demonstrate an "unmistakable intent" to indemnify the negligent party. Haynes v. Kleinewefers & Lembo Corp., 921 F.2d 453, 456 (2d Cir. 1990) (citing Kurek v. Port Chester Housing Auth., 18 N.Y.2d 450, 456 (1966), and Levine v. Shell Oil Co., 28 N.Y.2d 205, 211 (1971)).[1] If there is no express language indemnifying a party, the unmistakable intent must be "clearly implied from the language and purposes of the entire agreement." Haynes, 921 F.2d at 456 (citations and internal quotation marks omitted).

---

[1] New York law governs the interpretation of the APA, which contains an express choice-of-law provision designating the application of New York law. See N.Y. Gen. Oblig. Law § 5-1401.

5

"Contract language is unambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.'"  Met. Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990) (quoting Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 355 (1978)).  Plain language is not ambiguous merely because the parties urge differing interpretations.  Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989).  If indemnification is not the unmistakable intent of the parties, the claim must be dismissed.  See, e.g., Tonking v. Port Auth., 3 N.Y.3d 486, 490 (2004) (affirming the grant of a motion to dismiss because "the language of the parties is not clear enough to enforce an obligation to indemnify").

Tredegar's "Assumed Liabilities" are defined in Section 4.2 of the APA:

> As of the Closing Date, [Tredegar] (i) shall acquire the Purchased Assets subject only to, and (ii) shall undertake, assume, perform and otherwise pay, satisfy and discharge, and hold [Exxon] harmless from, only (x) the liabilities and obligations set forth on Schedule 4.2 and (y) the liabilities and obligations of [Tredegar] provided for in Article 14.0 hereof (collectively, the "Assumed Liabilities").

In Schedule 4.2, Tredegar's "Assumed Liabilities" include: "[a]ll obligations and liabilities relating to the ownership or operation of the Purchased Assets or the conduct of the Business

6

that arise out of an event, act or occurrence occurring subsequent to the Closing Date." APA Schedule 4.2[4].

Article 14.0 contains Section 14.4 of the APA, titled "Indemnification by [Tredegar]":

> "[Tredegar] General Liabilities" shall mean all Losses . . . resulting from, arising out of, or incurred by [Exxon] . . . after the Closing Date in connection with . . . (iii) any Assumed Liability or any attempt (whether or not successful) by any Person to cause or require [Exxon] to pay or discharge any Assumed Liability; . . . or (v) any liability arising out of or related to the operation of the Business after the Closing Date, other than Retained Liabilities.

Exxon's "Retained Liabilities" are defined as "all liabilities and obligations of [Exxon], whether such liabilities and obligations relate to payment, performance or otherwise, arise before or after the Closing, are matured or unmatured, are known or unknown, are contingent or non-contingent, are fixed or undetermined, or are present, future or otherwise, other than the Assumed Liabilities." APA § 1.67. The Retained Liabilities include: "any liability or obligation arising out of . . . any legal proceeding commenced after the Closing Date to the extent it arises out of, or relates to, any occurrence or event happening before the Closing Date." APA § 1.67(v).

Under the APA, Tredegar must indemnify Exxon when the relevant liability arises out of an event, act, or occurrence after the Closing Date. In the underlying litigation, the

7

Leinheisers alleged that Exxon breached its duty to "properly and adequately test, assemble, market, install, refurbish, modify, move, maintain, repair, distribute, transfer, and/or sell the subject machine in a reasonably safe condition," and that this negligence directly and proximately caused Leo Leinheiser's injuries. Leinheiser Compl. ¶¶ 35, 37. In light of the Leinheisers' allegations, Tredegar argues that Exxon's liability arises out of allegedly negligent conduct that occurred prior to the Closing Date, and the settlement is thus a Retained Liability.

Exxon counters that because the liability arises out of the April 20, 2007 accident, it is an Assumed Liability under Schedule 4.2[4] and Section 14.4(iii), and the analysis ends. Yet Exxon overlooks the fact that Assumed Liabilities are defined in Section 4.2 as "collectively" the liabilities in Schedule 4.2 and Article 14.0. Section 14.4(v), part of Article 14.0, refers to "any liability arising out of or related to the operation of the Business after the Closing Date, other than Retained Liabilities." Therefore, an analysis of the contract cannot begin and end with a reading of Schedule 4.2[4]. The definition of Assumed Liabilities must be considered alongside the definition of Retained Liabilities.

A liability cannot be both a Retained and an Assumed Liability. Exxon contends that any liability falling into both

8

categories should be treated as an Assumed Liability. Its support for this argument is simply that the definition of Retained Liabilities excludes Assumed Liabilities. As just noted, however, Section 14.4(v) is part of the definition of Assumed Liabilities, and it excludes Retained Liabilities. The contract does not express the intent that a liability potentially characterized as both an Assumed and a Retained Liability be considered an Assumed Liability.

It is clear that the settlement arises out of, in part, the April 2007 accident. The critical question is whether the liability also arises out of or relates to an occurrence or event before the Closing Date. If so, the APA is ambiguous as to whether this is an Assumed or Retained liability, and Exxon's claim fails.

In <u>Haynes v. Kleinewefers & Lembo Corp.</u>, the Second Circuit considered an indemnification claim arising in similar circumstances and affirmed the district court's dismissal of the claim. 921 F.2d 453, 459 (2d Cir. 1990). There, the fourth-party plaintiff had purchased the fourth-party defendant's business unit and machines. After the transaction, one of the purchaser's employees was injured by a plastic roller machine. It was alleged that the machine had been negligently modified by the seller. <u>Id.</u> at 455. The seller and purchaser each

eventually settled with the employee, and the seller sought indemnification from the purchaser.

Under the contract at issue in Haynes, the purchaser assumed liabilities arising in the ordinary course of business, whether prior to or after closing. Id. at 457. The seller argued, *inter alia*, that the phrase "ordinary course of business" encompassed liability for a personal injury occasioned by a defect in a product. Id.

Although the contract in Haynes is materially different, the Court's reasoning is instructive. It focused not on whether the injury occurred in the ordinary course of business, but on whether the negligent modification of the machine was the type of activity contemplated in the indemnification provision. Id. at 457-58. The Second Circuit concluded that the seller failed to meet the burden of establishing the parties' unmistakable intent to provide for indemnification in the contract. Id. at 456. Haynes supports the conclusion that the liability here "relates to" the allegations of negligence in the underlying litigation, i.e., pre-closing occurrences or events under Section 1.67(v).

Exxon also argues that the language of Section 1.67(v) does not encompass pre-closing negligence. This section states that a liability is retained if it arises out of or relates to an "occurrence" or "event." Exxon contends that negligence is an

10

"act," not an occurrence or event.  It contrasts Section 1.67(v) with Schedule 4.2[4], which refers to liabilities relating to the business "that arise out of an event, act, or occurrence occurring subsequent to the closing date" as Assumed Liabilities.

It is common practice for New York courts to refer to the dictionary to determine the ordinary meaning of words in a contract.  Federal Ins. Co. v. Am. Home. Assur. Co., 639 F.3d 557, 567 (2d Cir. 2011) (quotation marks and citations omitted).  "Occurrence" is defined as "something that takes place; *esp*: something that happens unexpectedly and without design."  Webster's Third New Int'l Dictionary (unabridged) 1561 (1986).  The Leinheisers' allegations of negligence easily arise out of or relate to an occurrence or event.  The fact that Section 1.67(v) does not include the word "act" is irrelevant.

Because it is ambiguous whether Exxon's settlement with the Leinheisers is a Retained or Assumed Liability, it is not the "unmistakable intent" of the parties that this settlement be treated as an Assumed Liability.  Accordingly, Exxon is not entitled to indemnification, and Tredegar's motion to dismiss Count I of the amended complaint is granted.

**II. Count II: Breach of Duty to Cooperate and to Provide Reasonable Access to Records and Employees**

Exxon alleges that Tredegar breached the APA by not providing reasonable access to records and employees. Exxon claims violations of Sections 12.6, 12.7, and 15.13 of the APA. Section 12.6, titled "Further Assurances of [Tredegar]," provides:

> From and after the Closing Date, [Tredegar] shall afford to [Exxon] and its attorneys, accountants and other representatives access, during normal business hours, to such books and records relating to the Business as may reasonably be required. [Tredegar] shall cooperate in all reasonable respects with [Exxon] with respect to its former interest in the Business and in connection with financial account closing and reporting, and claims and litigation asserted by or against third parties, including, but not limited to, making employees available to assist with, or provide information in connection with, financial account closing and reporting and claims and litigation, provided[] that [Exxon] reimburses [Tredegar] for its reasonable out-of-pocket expenses in connection therewith.

Tredegar contends that this section of the APA applies only to financial reporting and litigation related thereto, not to tort litigation. Yet the plain language of Section 12.6 contains no limitation on the type of litigation covered. Tredegar also asserts that it did not behave unreasonably. This is a factual question not appropriate for disposition on a motion to dismiss. It is plausible that Tredegar behaved unreasonably in denying Exxon access to records and employees.

12

By alleging that Tredegar refused to make records and employees available for Exxon's defense in the underlying litigation, Exxon has adequately pled a breach of Section 12.6.

Exxon also alleges that Tredegar violated Section 12.7, which states in relevant part:

> For a period of not less than ten (10) years after the Closing Date, [Tredegar] shall preserve and retain the corporate, accounting, legal, auditing and other books and records of the Business . . . *provided, however*, that such ten (10)-year period shall be extended in the event that any action, suit, proceeding or investigation has been commenced or is pending or threatened at the termination of such ten (10)-year period and such extension shall continue until any such action, suit, proceeding or investigation has been settled through judgment or otherwise or is no longer pending or threatened. . . .  [Tredegar] shall provide reasonable access to [Exxon] to review any records that [Tredegar] retains and to make copies thereof and shall cooperate fully with [Exxon] (including, without limitation, making available employees to assist [Exxon] at reasonable rates to be agreed by the Parties) in . . . the resolution of any tax audits, claims, litigation or disputes concerning [Exxon's] tax liabilities or the Assumed Liabilities or for any other reasonable business purpose. . . .

The ten-year period ended in May 2009, and the Leinheiser complaints were served on Exxon in June 2009.

Tredegar argues that Section 12.7 does not apply for two reasons.  First, it asserts that the litigation does not concern Assumed Liabilities.  Second, it contends that Exxon did not give Tredegar notice of the Leinheiser action until June 30, 2009 -- more than ten years after the Closing Date.

13

Tredegar's first argument fails.  As explained above, it is ambiguous whether the underlying litigation constitutes an "Assumed Liability."  This ambiguity is fatal to Exxon's claim for indemnification, which is evaluated under an "unmistakable intent" standard.  But Exxon's claim under Section 12.7 is not subject to this exacting standard.  Exxon's allegation of breach of this provision is sufficient to survive a motion to dismiss.

Tredegar's second argument presents a closer question. According to the amended complaint, Tredegar initially told Exxon that it would have the opportunity to inspect minutes of safety meetings, sign-in sheets for monthly training meetings, and videos played during monthly safety meetings.  Exxon does not specifically allege, however, that Tredegar was on notice of an action, suit, proceeding, or investigation prior to the conclusion of the ten-year period.  Even if Tredegar were on notice of potential claims on the day of Mr. Leinheiser's injury, Tredegar would not have been obliged to retain related records past the date of resolution of its liability to Mr. Leinheiser.  Thus, Exxon's claim with respect to access to records does not satisfy the ten-year period in Section 12.7. Nevertheless, Exxon has adequately alleged that Tredegar violated the portion of Section 12.7 concerning reasonable access to employees, because this portion of Section 12.7 is not limited to ten years.

14

Exxon also alleges that Tredegar breached its duty under Section 15.13 of the APA, "Cooperation," which requires the parties to "cooperate fully at their own expense, except as otherwise provided in this Agreement, with each other and their respective counsel . . . in connection with all steps to be taken as part of their obligations under this Agreement." Because Exxon has adequately pled breaches of Sections 12.6 and 12.7, it has also pled a breach of Section 15.13 of the APA.

Finally, Tredegar contends that the amended complaint does not allege any plausible damages and thus does not satisfy the pleading standards set forth in Twombly and Iqbal. "To establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004). In its amended complaint, Exxon alleges that "[a]s a direct and consequential result of Tredegar's breaches, Exxon was prejudiced in its defense of the Underlying Litigation and has suffered damages in an amount to be proven at trial." Am. Compl. ¶ 101. In addition, Exxon provides a factual basis for a finding of damages: it describes how Tredegar failed to make employees and records available to assist in Exxon's defense and how Tredegar assisted the Leinheisers to Exxon's detriment. Tredegar argues that these

15

damages are speculative and that if Exxon truly believed that Tredegar had material information, Exxon could have served a document or deposition subpoena.

Contrary to Tredegar's contentions, it is plausible that Exxon was prejudiced in its defense.  Exxon may have incurred unnecessary expenses because it believed, pursuant to the APA and Tredegar's assurances, that it would have consensual access to key documents and witnesses.  The cases Tredegar cites are distinguishable.  See, e.g., Lefkowitz v. Bank of N.Y., 676 F. Supp. 2d 229, 265–66 (S.D.N.Y. 2009) (dismissing a breach of contract claim for a failure to plausibly plead injury because there was "no basis for inferring any injury" and because the Westchester County Surrogate's Court explicitly found that plaintiff was not harmed by the defendant bank's actions). Because Tredegar's refusals plausibly affected Exxon's negotiations with the Leinheisers and the settlement amount, Exxon's allegations survive a motion to dismiss.

## CONCLUSION

For the foregoing reasons, Tredegar's motion to dismiss is granted as to Count I of the amended complaint.  The motion is denied as to Count II, except with respect to the access to records claim under Section 12.7 of the APA.


SO ORDERED.


Dated:   New York, New York
         September 12, 2012

                                    S/_____
                                      MIRIAM GOLDMAN CEDARBAUM
                                      United States District Judge